IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LARA R. N., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 20-cv-00582-SH |
| | ) |
| KILOLO KIJAKAZI,[1] Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Lara R. N. seeks judicial review of the decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-434. In accordance with 28 U.S.C. § 636(c), the parties have consented to proceed before a United States Magistrate Judge. For reasons explained below, the Court affirms the Commissioner's decision denying benefits.

**I.     Disability Determination and Standard of Review**

Under the Act, a "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment(s) must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage

---

[1] Effective July 9, 2021, pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of 42 U.S.C. § 405(g).

in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate disability claims. 20 C.F.R. § 404.1520. To determine whether a claimant is disabled, the Commissioner inquires into: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe medically determinable impairment(s); (3) whether the impairment meets or equals a listed impairment from 20 C.F.R. pt. 404, subpt. P, app. 1; (4) considering the Commissioner's assessment of the claimant's residual functional capacity ("RFC"), whether the claimant can still do her past relevant work; and (5) considering the RFC and other factors, whether the claimant can perform other work. *Id.* § 404.1520(a)(4)(i)-(v). Generally, the claimant bears the burden of proof for the first four steps. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). At the fifth step, the burden shifts to the Commissioner to provide evidence that other work the claimant can do exists in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

Judicial review of the Commissioner's final decision is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. *See Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The "threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). It is more than a scintilla but means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The

Court will "meticulously examine the [administrative] record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met," *Grogan*, 399 F.3d at 1262, but it will neither reweigh the evidence nor substitute its judgment for that of the Commissioner, *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). Even if a court might have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

## II. Background and Procedural History

Plaintiff applied for Title II disability benefits on August 24, 2016, with a protective filing date of August 18, 2016. (R. 23, 342-45.) In her application, Plaintiff alleged she has been unable to work since December 7, 2015, due to conditions including bipolar disorder and anxiety disorder. (R. 342, 391.) Plaintiff was 32 years old at the time of the ALJ's decision. (R. 23, 342.) Plaintiff has an associate degree and past relevant work as an accounting clerk, a file clerk, and a retail sales clerk. (R. 46-49, 74-76.)

Plaintiff's claims for benefits were denied initially and upon reconsideration. (R. 174-78, 180-82.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which the ALJ conducted on April 9, 2018. (R. 85-118, 183-84.) The first ALJ denied benefits and found Plaintiff not disabled. (R. 145-61.) The Appeals Council, however, remanded the case to a new ALJ to resolve certain additional issues.[2] (R. 166-70.) On remand, the ALJ held a second hearing on April 2, 2020. (R. 36-83.) Thereafter, the ALJ issued a decision denying benefits and again finding Plaintiff not disabled. (R.

---

[2] It is within the Court's jurisdiction to consider allegations that an ALJ failed to comply with an Appeals Council remand order. *See Noreja v. Comm'r*, 952 F.3d 1172, 1178 (10th Cir. 2020). Plaintiff, however, has made no such argument in her briefing. (*See* ECF No. 13 at 6-11.)

3

10-23.) The Appeals Council denied review on September 9, 2020 (R. 1-5), rendering the Commissioner's decision final, 20 C.F.R. § 404.981. Plaintiff timely filed this appeal on November 12, 2020 (ECF No. 2), within 65 days of that order. *See* 20 C.F.R. § 422.210(c).

## III. The ALJ's Decision

In his decision, the ALJ found Plaintiff met the insured requirements for Title II purposes through December 31, 2020. (R. 12.) The ALJ then found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 7, 2015.[3] (R. 13.) At step two, the ALJ found Plaintiff had the following severe impairments: (1) bipolar disorder; (2) borderline intellectual functioning; (3) anxiety disorder; and (4) mathematics disorder. (*Id.*) At step three, the ALJ found Plaintiff's impairments had not met or equaled a listed impairment. (R. 13-15.)

After evaluating the objective and opinion evidence, as well as Plaintiff's testimony, the ALJ concluded that Plaintiff had the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations:"

> The claimant can understand, remember, and carry out simple repetitive routine tasks. Job duties should not be fast paced (like an assembly line pace). The claimant could work towards a daily quota. Work product should not be a numerical work product (defined as not working with numerical data or generating numerical reports). Job duties should not require utilizing numerical instructions. The claimant could tolerate occasional public contact, but contact with coworkers should be limited to only a small group (defined as half a dozen or less) when interacting. The claimant would not have limitations on contact with supervisors.

(R. 15.) The ALJ then provided a recitation of the evidence that went into this finding. (R. 15-21.) At step four, the ALJ found Plaintiff unable to perform her past relevant work as an accounting clerk, file clerk, or retail sales clerk. (R. 21.) Based on the testimony of

---

[3] The ALJ noted that Plaintiff worked after the alleged disability onset date, but her work did not rise to the level of substantial gainful activity. (R. 13.)

a vocational expert ("VE"), however, the ALJ found at step five that Plaintiff could perform other work that existed in significant numbers in the national economy, such as garment hanger, laundry sorter, and folder. (R. 22.) Accordingly, the ALJ concluded Plaintiff was not disabled. (R. 23.)

**IV.   Issues**

Plaintiff raises two allegations of error in her challenge to the denial of benefits: (1) the RFC was unsupported by substantial evidence; and (2) the step-five evaluation was improper, as the ALJ failed to follow certain testimony of the VE. (ECF No. 13 at 6-11.) Neither of these arguments is persuasive. As such, the undersigned affirms the ALJ's well-reasoned opinion.

**V.   Analysis**

Much of Plaintiff's argument centers on her claim that the ALJ painted an improper picture of her functional capabilities in the RFC. (*Id.* at 6-10.) According to Plaintiff, her mental impairments render her unable to "effectively negotiate activities outside of her home on a sustained basis . . . ." (*Id.* at 9.) This, she maintains, is evidenced by her severely "structured environment," which the ALJ purportedly failed to consider. (*Id.* at 7-10.) Contrary to Plaintiff's claims, however, the ALJ accounted for her limited environment as a part of the sequential analysis and properly evaluated her subjective complaints—along with the objective and opinion evidence—in coming to the RFC. (*See generally* R. 13-21.) The Court will not reweigh the evidence to reach a different conclusion. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

### A. The ALJ Properly Considered Plaintiff's Mental Impairments in the RFC

#### 1. Applicable Standards

While ALJs apply a "special technique" to determine the severity or non-severity of mental impairments, the five-step sequential process still generally governs the evaluation of a claimant's limitations. 20 C.F.R. § 404.1520a(a) (referring to the "steps outlined in § 404.1520"). As the ALJ noted (R. 15), the analysis of a claimant's mental impairments does not stop at a determination of severity, but instead continues in the RFC assessment used at steps four and five. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July 2, 1996). This assessment is based on all the relevant evidence in the record, including—among other things—reports of daily activities, the effects of symptoms that are reasonably attributable to a medically determinable impairment, and the need for a structured living environment. *Id.* at *5.

When evaluating symptoms, the ALJ uses a two-step process.[4] *See* SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017); *see also* 20 C.F.R. § 404.1529 (regulation governing the evaluation of symptoms). First, the medical signs or laboratory findings must show the existence of medical impairment(s) that result from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the symptoms alleged. SSR 16-3p, at *3. Second, once such impairment(s) are established, the ALJ must evaluate the intensity and persistence of the symptoms, so he can determine how the symptoms limit the claimant's capacity to work. *Id.* at *4. Factors

---

[4] Tenth Circuit precedent has characterized this as a three-step process, citing *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987). *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166-67 (10th Cir. 2012). The two-step analysis under SSR 16-3p comports with this prior, three-step process under *Luna*. *Paulek v. Colvin*, 662 F. App'x 588, 593-94 (10th Cir. 2016) (unpublished). The term "credibility," however is no longer used. SSR 16-3p at *2.

6

the ALJ should consider as part of the symptom evaluation include: (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of medications; (v) treatment aside from medication; (vi) any other measures the claimant has used to relieve the symptoms; and (vii) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *Id.* at *7-8. The ALJ's findings regarding symptoms "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). However, a "formalistic factor-by-factor recitation of the evidence" is not required "[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's" symptoms.[5] *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). Because subjective symptom findings are "peculiarly the province of the finder of fact," reviewing courts should "not upset such determinations when supported by substantial evidence." *Cowan*, 552 F.3d at 1190 (quoting *Kepler*, 683 F.3d at 391).

In considering the evidence for a claimant's mental RFC, the ALJ focuses on the capacity to perform "[w]ork-related mental activities generally required by competitive, remunerative work," which "include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to

---

[5] That is not to say an ALJ may simply make "a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, at *10. Rather, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*

supervision, coworkers and work situations; and deal with changes in a routine work setting." SSR 96-8p, at *6. *See also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (noting the Ruling provides "guidance concerning the focus of the ALJ's assessment of the claimant's mental RFC").

### 2. The ALJ's Analysis of Plaintiff's Symptoms and RFC

In this case, the evidence relating to Plaintiff's need for a structured environment comes from her reports to doctors and her testimony regarding her subjective symptoms. (ECF No. 13 at 7-8.) The ALJ addressed this evidence at step three and in determining the RFC.

As part of the "special technique" at step three, the ALJ discussed Plaintiff's testimony about her need for a structured setting and compared it to the other evidence in the record. (R. 13-15.) Then, the ALJ turned to his analysis of Plaintiff's RFC and, in the process, analyzed her alleged symptoms.

First, he determined, after consideration of the record evidence, that Plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms . . . ." (R. 15-20 (relying on statements made by Plaintiff at the April 2020 hearing, the consultative examination ("CE") conducted by Dr. Minor Gordon, objective mental status examinations, treatment notes, and the testimony of Dr. Jeffrey Andert).) Second, he considered whether Plaintiff's subjective statements regarding her mental limitations, when evaluated alongside all other objective evidence, led to the conclusion that she was disabled. He found they did not. (R. 20 ("[C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record").) As a part of this analysis, the ALJ sufficiently assessed Plaintiff's subjective complaints.

In accordance with 20 C.F.R. § 404.1529(c)(3), the ALJ weighed factors such as Plaintiff's daily activities;[6] the location, duration, frequency, and intensity of Plaintiff's symptoms;[7] precipitating and aggravating factors;[8] the effectiveness of the medication Plaintiff took to alleviate her symptoms;[9] and the other measures Plaintiff has taken or used to relieve her symptoms.[10] Only after this analysis did the ALJ hold that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were

---

[6] The ALJ noted Plaintiff's testimony that social anxiety caused her to be unable to function outside the home and that she only left it for doctor's appointments and to get gas. (R. 16.) But, he found she also reported driving herself and her husband places, caring for pets, going on walks, attending concerts and professional sporting events as recently as 2017, going on hiking trips, preparing meals, performing household chores, and going online for social media and news. (R. 16-18.) The ALJ also noted that, at various times after the alleged onset of disability, Plaintiff sent out job applications, worked as a part-time babysitter, visited a pool occasionally, engaged in outdoor summer activities, traveled out of state, and cared for her sick mother. (R. 17-20.)

[7] The ALJ noted Plaintiff's testimony that her bipolar disorder and social anxiety caused her difficulty functioning outside the home. (R. 16.) The ALJ further considered Plaintiff's testimony regarding symptoms of elevated heart rate, paranoia, and hyperawareness of her surroundings when in public, alongside findings that her bipolar disorder was in fair remission with medications (R. 16-17); objective examinations showing Plaintiff's orientation, thought processes and content, perception, memory, and intelligence were within normal limits (R. 18); and treatment notes demonstrating that Plaintiff often presented as "doing okay" with medication (*id.*).

[8] The ALJ noted Plaintiff's testimony of anxiety attacks when performing tasks outside her home, such as while grocery shopping and attempting to work with the public (R. 16) and her reports of social isolation and avoidance (R. 19).

[9] The ALJ noted Plaintiff's bipolar disorder was observed as being in fair remission with medications (R. 17) and treatment notes indicating medication steadily improved her condition and otherwise kept it stable (R. 18).

[10] At step three, the ALJ considered Plaintiff's claim that she is "only able to function due to the fact that she is in a socially isolated environment/structured setting" but listed evidence he believed to be contradictory, such as post-onset instances where she attended sporting events and concerts, traveled for appointments and leisure, and cared for children and ailing mother. (R. 15.) Without using the term "structured," the ALJ again addressed Plaintiff's testimony regarding not leaving her home when assessing her RFC, considering it in light of the aforementioned contrary evidence. (R. 16-18.)

9

not wholly consistent with the record. Contrary to Plaintiff's contention, this was a proper evaluation under applicable law.

Additionally, after this assessment—and after a thorough analysis of the objective and opinion evidence contained in the record (R. 16-21)—the ALJ more than adequately accounted for Plaintiff's limitations through an RFC relayed in terms of work-related mental activities as instructed by SSR 96-8p (R. 15). Specifically, the RFC addressed her remaining capacity to understand, carry out, and remember instructions (limiting Plaintiff to carrying out simple, repetitive, routine tasks); her ability to use judgment in work-related decisions (limiting the scope of her work, and her work-related decisions, to non-fast paced, non-numerical work); her capability to respond to coworkers and supervisors (limiting her to only occasional interaction with the public and limited interaction with a small group of coworkers); and her ability to deal with changes in a routine work setting (ensuring her work was repetitive and routine, rather than fast-paced and changing). (R. 15.)

As such, the RFC was supported by substantial evidence, and Plaintiff's remaining arguments fail.

### 3. **Plaintiff's Remaining Arguments**

#### a) **The ALJ properly analyzed the support Plaintiff receives.**

First, Plaintiff asserts that the preamble to the mental disorder listings contained in Listing 12.00 bolsters her argument that the RFC was flawed. (*Id.* at 8.)

Plaintiff does not argue that she met or equaled a listing, or that the ALJ otherwise failed at step three. Instead, Plaintiff asserts that the ALJ "ignored" a discussion preceding the listings for mental disorders in a section entitled "*How do we consider*

10

*psychosocial supports, structured settings, living arrangements, and treatment?"* and, particularly, a subsection on *"How we consider the help or support you receive."* 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A, 12.00D3. Presumably, Plaintiff is asserting that—in conducting the "more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments," SSR 96-8p, at *4—the ALJ failed to take into account "how" he was to consider these supports. The sections Plaintiff cite read, in their entirety, as follows:

> a. We will consider the complete picture of your daily functioning, including the kinds, extent, and frequency of help and support you receive, when we evaluate your mental disorder and determine whether you are able to use the four areas of mental functioning in a work setting. The fact that you have done, or currently do, some routine activities without help or support does not necessarily mean that you do not have a mental disorder or that you are not disabled. For example, you may be able to take care of your personal needs, cook, shop, pay your bills, live by yourself, and drive a car. You may demonstrate both strengths and deficits in your daily functioning.
>
> b. You may receive various kinds of help and support from others that enable you to do many things that, because of your mental disorder, you might not be able to do independently. Your daily functioning may depend on the special contexts in which you function. For example, you may spend your time among only familiar people or surroundings, in a simple and steady routine or an unchanging environment, or in a highly structured setting. However, this does not necessarily show how you would function in a work setting on a sustained basis, throughout a normal workday and workweek. (See 12.00H for further discussion of these issues regarding significant deficits in adaptive functioning for the purpose of 12.05.)

20 C.F.R. pt. 404, subpt. P, app. 1, pt. A, 12.00D3.

As discussed *supra*, the ALJ considered the "complete picture" of Plaintiff's daily functioning. (R. 13-21.) He did not find that Plaintiff was unimpaired simply because she engaged in activities independently. (R. 13 (finding Plaintiff had numerous severe mental impairments).) Nor did the ALJ discount, without discussion, Plaintiff's claims that she

11

needed a structured environment to function. (R. 14-15.) Instead, the ALJ considered the record as a whole—including Plaintiff's subjective complaints and the objective and opinion evidence[11]—to reach the conclusion that, although Plaintiff was impaired, she could do work that exists in significant numbers in the national economy. (R. 13-23.) The Court is, therefore, not convinced the ALJ "ignored" the statement contained in Listing 12.00D3.

### b) The Court will not reweigh the ALJ's evaluation of disputed evidence.

Second, Plaintiff takes issue with the manner in which the ALJ evaluated specific portions of the record. These contentions are essentially requests for the Court to reweigh evidence and come to a decision in Plaintiff's favor.

For example, Plaintiff disputes the ALJ's use of testimony showing Plaintiff previously attended concerts and sporting events. (ECF No. 13 at 8.) She contends that, because she no longer engages in these activities—and because the record indicated she does not care for crowds—the ALJ's treatment of this evidence was improper. (*Id.*) There are numerous issues with this argument. First, medical records showed Plaintiff went to a concert and sporting event as recently as 2017. (R. 673.) The alleged onset of Plaintiff's disability was December 7, 2015. (R. 342.) As such, Plaintiff's attendance of concerts and sporting events is more than relevant in the ALJ's discussion of whether Plaintiff was

---

[11] In addition to reviewing Plaintiff's testimony and the treatment notes from Plaintiff's providers, the ALJ placed "great weight" in the opinion of Dr. Andert, the medical expert who testified at the hearing. (R. 19-20.) Dr. Andert considered the entire record, including Plaintiff's isolated pattern of functioning and her "dependent" living arraignments. (R. 63-64.) Dr. Andert opined that Plaintiff would be limited to simple, routine, and repetitive tasks and would only be suited for limited contact with the public and coworkers. (R. 65.) The ALJ adopted this opinion in the RFC. (R. 15.)

disabled after 2015.[12] Second, Plaintiff does not explain how her difficulty in crowds is not adequately addressed by the RFC. (R. 15 (limiting Plaintiff to occasional public contact and to contact with coworkers in groups of six or less people).)

Similarly, Plaintiff points to evidence the ALJ discussed in his RFC evaluation—such as Plaintiff's daily activities and examples of her caring for her mother or babysitting—and argues that such evidence does not demonstrate she can work an eight-hour day or go outside her house. (ECF No. 13 at 9.) Plaintiff contends that the Court should find these activities instead stand for the proposition that Plaintiff is extremely restricted and does not have the functional capacity to engage in any work activity. It is not the job of the undersigned to reweigh evidence the ALJ adequately considered in his decision. *Bowman*, 511 F.3d at 1272. The evidence Plaintiff highlights—her driving, caring for pets, going on walks, hiking with her husband, going on social media, assisting with meals (ECF No. 13 at 9)— it all was considered by the ALJ (R. 13-21). Moreover, in addition to evidence of Plaintiff's activities, the ALJ considered the objective record and opinions contained therein, comparing Plaintiff's subjective testimony with evidence from her medical providers and examining physicians, to come to Plaintiff's RFC. This is all the ALJ was required to do.

---

[12] The record is not entirely consistent on the reason why Plaintiff stopped going to basketball games or concerts, or that it was even as far back as 2017 when last she went. On April 2, 2020, Plaintiff testified: "Well, we don't go to them anymore. . . . Actually, that's probably just because of financial reasons as well. We don't go to them anymore. Maybe once a year we might do something like that, but we have not been in the last, I'd say, probably last summer, maybe. More recently." (R. 52.)

### c) The ALJ's decision was not contrary to the medical testimony.

Lastly, Plaintiff briefly notes that Dr. Andert "agreed that [her] condition could have been considered improved or good because she avoided stress" and asserts that this testimony "backs up" her arguments as to her need for a structured environment. (ECF No. 13 at 9-10 (citing R. 72).) Plaintiff appears to be referring to the following exchange from the hearing:

> Q    Well, could it be that the records showing that she is doing better could be because she's staying in her sheltered environment more?
>
> A    It's possible. If an individual – if stress aggravates symptoms, obviously, if you avoid stressors, you have less symptoms.

(R. 72.) While Dr. Andert testified that an individual, generally, may avoid stressors and have less symptoms, he also testified that <u>Plaintiff's</u> mental RFC was that adopted by the ALJ. (R. 15, 65-66.) Moreover, as noted above, the ALJ accounted for Plaintiff's expressed anxiety and symptoms when "attempting to perform tasks outside the home" in crafting the RFC, and the ALJ did so by relying on more than just Plaintiff's in-home activities. Plaintiff is asking the Court to provide more <u>weight</u> to Plaintiff's testimony of the effects of her anxiety attacks outside the home and, again, is asking the Court to reach a different conclusion than that of the ALJ.

But, the question before the Court is whether there was substantial evidence in the record supporting the ALJ's view of Plaintiff's RFC. In this case, there was. The ALJ sufficiently considered and accounted for Plaintiff's functional limitations in the RFC.

### B. The ALJ's Step-Five Analysis was Proper

In tandem with the arguments above, Plaintiff also asserts that the ALJ failed to follow the VE's testimony at step five. (ECF No. 13 at 10-11.) The Commissioner rejoins that Plaintiff is not arguing the VE's testimony conflicted with the Dictionary of

Occupational Titles or was otherwise deficient and claims Plaintiff essentially rehashes her RFC arguments. (ECF No. 16 at 12.) The Court agrees with the Commissioner but briefly address Plaintiff's positions.

First, Plaintiff argues that, because "the ALJ failed to develop a proper RFC in this case[,] it follows that he did not properly develop the vocational testimony in this case." (ECF No. 13 at 10.) That is, Plaintiff contends that the ALJ's first hypothetical to the VE—which is a restatement of the RFC (R. 76-77)—was "faulty in that it failed to consider Plaintiff's correct physical and mental RFC" and "did not include the Plaintiff's need to spend the day in a sheltered environment (at home), and difficulty with other people." (ECF No. 13 at 11.) As the Court has already found the RFC supported by substantial evidence—i.e., finding the ALJ <u>did</u> develop a proper RFC—Plaintiff's first argument fails.

Second, Plaintiff argues the ALJ failed explain why he rejected VE testimony that was based on a more restrictive hypothetical. (*Id.* at 10-11 (citing *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996).) *Clifton* is often cited for the propositions that "[t]he record must demonstrate that the ALJ considered all of the evidence" and that ALJs should discuss the uncontroverted evidence not relied upon and significantly probative evidence that is rejected. 79 F.3d at 1009-10. Plaintiff maintains the ALJ's decision was flawed under *Clifton,* because it did not discuss or discredit the more restrictive hypothetical. (ECF No. 13 at 11.) The Court disagrees.

"The hypothetical question [to the VE] should include all—<u>and only</u>—those impairments borne out by the evidentiary record." *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) (emphasis added). An ALJ is "not required to accept the answer to a hypothetical question that included limitations . . . not accepted by the ALJ as supported

15

by the record." *Id.* The hypothetical[13] cited by Plaintiff contains an additional limitation not ultimately adopted in the RFC—being absent two or more days a month. (*Compare* R. 79 *with* R. 15.) There is nothing in the legal authority cited by Plaintiff that requires an ALJ to explain why he declined to violate Tenth Circuit precedent by adopting testimony that conflicted with the RFC. In any event, the ALJ <u>did</u> offer an explanation as to why he adopted the RFC and, by extension, credited the VE's testimony under the first hypothetical. (*See generally* R. 13-21.) No further explanation was required.

## VI. Conclusion

For the foregoing reasons, the ALJ's decision finding Plaintiff not disabled is **AFFIRMED**.

**SO ORDERED** this 23rd day of February, 2022.

**SUSAN E. HUNTSMAN, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

---

[13] Plaintiff argues that there were two rejected hypotheticals adding additional limitations of (1) being absent once a week and (2) needing frequent intervention and close supervision to keep on task. (ECF No. 13 at 10.) There is nothing in the record indicating the existence of the second hypothetical.